**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| CAROLYN AVANT, | | |
| | * | |
|     **Plaintiff,** | | |
| **v.** | * | **Case No.: GJH-13-02989** |
| | | |
| SOUTHERN MARYLAND HOSPITAL, | * | |
| INC., | | |
| | * | |
|     **Defendant.** | | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

This is an age discrimination case brought by Carolyn Avant ("Avant") against her former employer, Southern Maryland Hospital, Inc. ("the Hospital"), for purported violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634, *et seq.*, and the Maryland Fair Employment Practices Act, § 20-606, Md.Code Ann., State Gov't. Avant also alleges that her rights under the Family Medical Leave Act, ("FMLA"), 29 U.S.C.A. §§ 2601-2654, were violated. This Memorandum Opinion and accompanying Order address the Hospital's Motion for Summary Judgment, ECF No. 42. A hearing is not necessary. *See* Loc. R. 105.6 (Md.). For the reasons stated below, the Hospital's Motion for Summary Judgment is GRANTED. Avant's complaint is therefore dismissed with prejudice.

## I.     BACKGROUND

Avant was hired by the Hospital on August 7, 1995 as Manager of the Hospital's Central Supply Department. *See* ECF No. 52-4 at 8. In 2008, Avant's job title was changed to Director of Central Supply Department. *See id.* In August 2011, Lynn Bode ("Bode") was hired as the

Hospital's Administrative Director of Surgical Services and became Avant's supervisor. *See* ECF No. 44 at ¶ 2; *see also* ECF No. 42-1 at 15.

The Central Sterile Supply Department maintains and processes the Hospital's supply of patient care equipment and sterile instruments, including the collection, decontamination, assembly, sterilization, high-level disinfection, and distribution of all instruments and equipment to various units in the Hospital, including those used in surgery. *See* ECF No. 44 at 2-3 at ¶¶ 8-9, 11. As the Director of the Central Supply Department, Avant was responsible for "direct[ing] and coordinat[ing] activities related to the preparation, distribution and control of sterile/non-sterile supplies, equipment and instrumentation throughout Perioperative Services and the units within the hospital." *Id.* at 12. Specifically, Avant was responsible for "overseeing the sterilization of surgical instruments, providing leadership management to Central Supply Department technicians ([]"CS Techs") . . . , identifying CS Techs' learning needs and recommending educational methods . . . , providing verbal and/or written feedback to [Bode], and reporting problems concerning Central Supply Department employees to [Bode]." ECF No. 57 at 3.

In addition to her responsibility for supervising the CS Techs, it is undisputed that Avant also had some oversight responsibilities for the Instrument Technicians staffed in the Operating Room. As early as 2008, Avant's previous supervisors indicated in her performance evaluations their desire for her to "[a]ssume responsibility for the Instrument Aides in the [Operating Room]." ECF No. 42-5 at 125. By the time Bode became Avant's supervisor, this responsibility was clearly expressed to her. In fact, at Avant's deposition, she testified that shortly after Bode was hired, the two of them had a discussion during which Bode informed her that she was responsible for the performance of the Instrument Technicians in the Operating Room. *See id.* at

46-47 at 104:12-105:12. Indeed, when issues involving Operating Room Instrument Technicians would arise, Bode would contact Avant for explanation. *See* ECF No. 44 at 17. Furthermore, Avant was responsible for "complet[ing] the OR Instrument Technicians' performance evaluations . . . ." ECF No. 57 at 4; *see also* ECF No. 42-5 at 20 at 51:9-14.

Shortly after Bode was hired, she became aware of patient safety issues relating to the contamination of surgical instrumentation and an increase in patient infections. *See* ECF No. 44 at ¶ 5; *see also* ECF No. 42-6 at 17:4-19:17. Specifically, sets of instruments used in orthopedic surgical procedures that were supposed to have been sterilized were found to be contaminated with bio-burden (*i.e.*, human tissue and body fluids). *See* ECF No. 42-6 at 19:18-20:12; *see also* ECF No. 44 at ¶ 6. In addition, upon arrival, Bode learned that the Hospital had had eight surgical site infections in orthopedic joint replacement cases from January 2011 to August 2011, which was above its normal rates. *See* ECF No. 42-6 at 17:4-19:17; *see also* ECF No. 44 at ¶ 6. As a result of the increased number of infections, the Hospital lost a significant amount of orthopedic surgical business. *See* ECF No. 42-6 at 125:1-126:5; *see also* ECF No. 44 at ¶ 6. In fact, Bode received complaints from surgeons who had decided to take their surgical business away from the Hospital due to the infection problem. *See* ECF No. 44 at ¶ 6. Bode attributed the high infection rates for orthopedic surgeries to the Operating Room Instrument Technicians' lack of training and failure to follow updated standards and recommendations pertaining to instrument reprocessing. *See* ECF No. 42-6 at 11 at 32:6-35:7.

In recognition of the increased infection rate, the Hospital, in January 2012, engaged the services of a company known as STERIS to conduct an initial assessment of the Central Supply Department's procedures. *See* ECF No. 44 at 5 at ¶ 13. On February 6, 2012, STERIS provided the Hospital with its initial assessment. In addition to its concerns about the physical layout of

the Operating Room's decontamination area, STERIS found that the Operating Room Instrument Technicians and CS Techs did not understand the distinction between dirty and clean areas and were not taking off their dirty gloves before assembling the cleaned instruments for sterilization. *See id.* at ¶¶ 13-14; *see also* ECF No. 44 at 18-32. Based on this assessment, Bode decided that an in-depth review of the functions of the Central Sterile Supply Department was necessary in order to fully understand the extent and severity of the issues identified by STERIS. *See* ECF No. 44 at 6 at ¶ 15. The Hospital therefore engaged SterilTek, the professional consulting division of STERIS, to conduct a more comprehensive, two-week assessment of the Central Sterile Supply Department. *See id.*

In March 2012, prior to the completion of the two-week SterilTek assessment, but after the completion of the initial STERIS review, Avant applied for, and received, FMLA leave in order to care for her ill son. *See* ECF No. 2 at ¶ 19. Avant began to take her FMLA leave in early March 2012. *See id.* In May 2012, while Avant was still on leave, SterilTek began its review of the Central Sterile Supply Department. At the end of SterilTek's assessment, it produced an 89-page report (the "SterilTek Report") detailing the observed deficiencies of the Central Sterile Supply Department.[1] Specifically, the SterilTek Report noted that there were "[m]ajor areas of non-compliance with industry standards, regulations, and best practices" and that the Hospital "[m]ust immediately correct sterilization issues and then improve decontamination practices." ECF No. 45 at 13. Furthermore, the assessment concluded that there was a "total lack of knowledge and management of the sterilization processes." *Id.*

As it related to Avant specifically, the SterilTek Report concluded that she [1] "[l]ack[ed] [an] understanding and ability to implement process controls to ensure timely and quality

---

[1] The Court notes that, despite being on FMLA leave, SterilTek executives were able to meet with and interview Avant in formulating the SterilTek Report. *See* ECF No. 45 at 70.

performance by the staff"; [2] "[l]ack[ed] [an] understanding that department performance and compliance requires continued attention to detail and follow-up"; [3] "[l]ack[ed] [an] understanding or inability to implement basic sterile processing requirements within sterilization thus resulting in major patient care violations"; [4] "[l]ack[ed] [] follow through in monitoring and completing Process Improvement initiatives assigned by direct supervisor"; and [5] "[l]ack[ed] [] any active training and education program outside of new hire learning by shadowing other staff." *Id.* at 71. Based on these findings, the SterilTek Report recommended that the Hospital "take corrective action to remedy this situation as soon as possible." *Id.*

Additionally, following the release of the SterilTek Report, John Kimsey ("Kimsey"), the SterilTek executive who drafted the report, sent a letter to Bode on May 18, 2012 that provided "additional observations and comments pertaining to [the Central Sterile Supply Department's] performance and leadership abilities." *Id.* at 99. Specifically, Kimsey observed that "[i]n ten years of performing assessments and working in over 200 hospitals nationwide, [the Hospital's Central Sterile Supply Department] rank[ed] as the worst department we have seen and [] received the lowest assessment rankings and scores I have personally ever seen." *Id.* Kimsey went on to say that he had "never seen a [Central Sterile Supply Department] score in the red in Decontamination, Assembly, and Sterilization" and that the department "was absolutely unaware of the regulations, best practices, or basic monitoring that [was] required." *Id.* Finally, Kimsey expressed his "lack of faith in [the Hospital's] current leadership team consisting of your CS Director [*i.e.* Avant] and 2nd Shift Supervisor." *Id.*

Based on these remarks, as well as the findings contained in the SterilTek Report, Bode recommended to her immediate supervisor and to the President of the Hospital that Avant be relieved of her duties. They agreed. Therefore, on May 24, 2012, Avant, while still on FMLA

leave, was summoned to the Hospital, whereupon she was given the option of resigning in lieu of termination. *See* ECF No. 57 at 21. Avant accepted. *See id.* At the time of her forced resignation, Avant was 67 years old. *See id.* at 1.

After pursuing her administrative remedies, Avant filed this lawsuit on September 19, 2013 in the Circuit Court of Maryland for Prince George's County claiming that she was discriminated against based on her age, as well as interference with, and retaliation for, exercising her FMLA rights. *See* ECF No. 1; *see also* ECF No. 2. On October 10, 2013, the Hospital removed the case to this Court. *See* ECF No. 1. Following the completion of discovery, the Hospital filed a motion for summary judgment. *See* ECF No. 42. That motion is now fully briefed and is presently before the Court. For the reasons discussed more fully below, the Court will GRANT the Hospital's motion.

## II.    STANDARD OF REVIEW

Summary judgment is proper if there are no issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Francis v. Booz, Allen & Hamilton, Inc.,* 452 F.3d 299, 302 (4th Cir. 2006). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson,* 477 U.S. at 248–49. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1986). The Court may only rely on facts supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative

6

obligation ... to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Grave–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255.

## III.   DISCUSSION

### A.   Age Discrimination in Employment Act

Avant contends that she was discriminated against on the basis of her age in violation of the ADEA when she was forced to resign on May 24, 2012. *See* ECF No. 2 at ¶¶ 29-34.

Section 4(a)(1) of the ADEA, 29 U.S.C. § 623(a)(1), provides, in pertinent part: "It shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." In order to establish a cause of action under the ADEA, "a plaintiff must demonstrate that *but for* the employer's motive to discriminate against the plaintiff on the basis of age, the plaintiff would not have been discharged." *E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 940 (4th Cir. 1992) (emphasis added).

"The Fourth Circuit recognizes two avenues of proof by which an employee can prove an ADEA violation: '(1) under ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue, or (2) under a judicially created proof scheme originally used in the Title VII context in [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, (1973)] and subsequently adapted for use in ADEA cases.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (quoting *Tuck v. Henkel Corp.*, 973 F.2d 371, 374-75 (4th Cir. 1992)); *Clay Printing*, 955 F.2d at 940. Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination. *See McDonnell Douglas*, 411 U.S. at

802; *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 (4th Cir. 2002). If a plaintiff establishes a *prima facie* case of discrimination through circumstantial evidence, the burden of production then shifts to the defendant to provide a legitimate, non-discriminatory reason for the differential treatment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *McDonnell Douglas*, 411 U.S. at 802. The plaintiff must then "'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves*, 530 U.S. at 142 (quoting *Burdine*, 450 U.S. at 253). In the end, "[t]he plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her." *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Burdine,* 450 U.S. at 253). Here, Avant has put forth no direct or indirect evidence of intentional age discrimination surrounding her employment with the Hospital, and thus, she must proceed under the *McDonnell Douglas* burden-shifting framework.

### 1.    Prima Facie

To satisfy the *McDonnell Douglas* burden-shifting framework, Avant must first demonstrate a prima facie case of age discrimination by showing that she (1) was a member of the protected group, *i.e.*, over the age of 40; (2) suffered an adverse employment action; (3) was meeting her employer's legitimate expectations at the time of her termination; and (4) was replaced by someone significantly younger or outside the protected group. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 455 (4th Cir. 1989); *see also O'Connor v. Consol. Coin Caterers Corp.*, 116 S.Ct. 1307, 1310 (1996) (replacement worker must be substantially younger than the plaintiff).

It is undisputed that Avant, who was 67 years old at the time of her termination, is a member of a protected class, suffered an adverse action when she was forced to resign from the Hospital on May 24, 2012 and was replaced by someone significantly younger than her (*i.e.* Dawn Hunt, 41 years old). *See* ECF No. 42-1 at 21-22. Avant has therefore satisfied elements one, two, and four of her prima facie case. As to the third element, however, Avant has failed to establish that she was meeting the Hospital's legitimate job expectations as the Director of the Central Supply Department at the time of her termination.

To satisfy this burden at the summary judgment stage, it is simply not enough for Avant to rely, as she does, on her own self-serving allegations that she "was meeting her employer's legitimate job expectations, as she successfully managed the Central Supply Department for over twenty (20) years, and was never subjected to disciplinary action." ECF No. 2 at ¶ 27. To be sure, Avant's "own perception of her job performance cannot create an issue of fact on this element." *Evans*, 80 F.3d at 960-961; *see Pepper v. Precision Valve Corp.*, 526 F. App'x 335, 337 (4th Cir. 2013) (recognizing that plaintiff's "self-serving statements regarding his job performance are insufficient to show that he met [his employer's] legitimate performance expectations"); *see also Ingram v. Baltimore Gas & Elec. Co.*, No. 02-2869, 2004 WL 350583, at *10 (D. Md. Feb. 25, 2004) (granting summary judgment in favor of defendant-employer where plaintiff "offers only his own self-serving assertions that his performance during this period was satisfactory"); *Mabry v. Capital One, N.A.*, No. 13-02059, 2014 WL 6875791, at *3 (Dec. 3, 2014) (granting summary judgment in favor of defendant-employer where plaintiff "rel[ied] on her own self-serving allegations that she was a competent employee who performed her duties and responsibilities in a satisfactory manner").

Nor can Avant rely on the fact that she "received exemplary performance reviews from Mr. Wilson, her immediate supervisor from approximately 2008 to mid-2009, and Ms. Nuendorf, her immediate supervisor from approximately mid-2009 to August of 2011" to demonstrate her satisfactory performance. *See* ECF No. 57 at 39. At the time of Avant's forced resignation in May 2012, nine months had passed since Ms. Nuendorf supervised Mabry and nearly three years had passed since Mr. Wilson supervised her.  Ms. Nuendorf's and Mr. Wilson's assessments of Avant's performance "months [or years] before she was terminated is therefore irrelevant to her prima facie case." *Mabry*, No. 13-02059, 2014 WL 6875791, at *4. Instead, Avant must actually "demonstrate that [s]he was generally satisfying [her] employer's relevant, objective performance standards at the time of [her] termination." *Brown*, 2012 WL 3136457, at *7. And while this burden "is not onerous" (*id.*), Avant has failed to meet it here.

Avant was the Manager of the Hospital's Central Supply Department. In that capacity she was responsible for "direct[ing] and coordinat[ing] activities related to the preparation, distribution, and control of sterile/non-sterile supplies, equipment and instrumentation throughout Perioperative Services and the units within the hospital," including within the Central Supply Department of the Operating Room. *See* ECF No. 42-5 at 121. After the Hospital learned in 2011 that the Central Supply Department was struggling to effectively manage its internal processes and controls, Bode commissioned an assessment of the department. That assessment, which ultimately led to the SterilTek Report, revealed vast deficiencies in the overall performance of Avant's job responsibilities, namely sterilization and decontamination practices.

As previously discussed, the SterilTek Report noted that within Avant's department there were "[m]ajor areas of non-compliance with industry standards, regulations, and best practices." ECF No. 45 at 13. The report concluded that there was a "total lack of knowledge and

management of the sterilization processes" (*id.*), and that Avant was "incapable of effectively managing the department." *Id.* at 71. Furthermore, the SterilTek Report specifically concluded that Avant "[l]ack[ed] [an] understanding and ability to implement process controls to ensure timely and quality performance by the staff"; "[l]ack[ed] [an] understanding that department performance and compliance requires continued attention to detail and follow-up"; "[l]ack[ed] [an] understanding or inability to implement basic sterile processing requirements within sterilization thus resulting in major patient care violations"; "[l]ack[ed] [] follow through in monitoring and completing Process Improvement initiatives assigned by direct supervisor"; and "[l]ack[ed] [] any active training and education program outside of new hire learning by shadowing other staff." *Id*. To make matters worse, Kimsey, the SterilTek executive who prepared the SterilTek Report, concluded that the Hospital's Central Sterile Supply Department "rank[ed] as the worst department [he had] seen and received the lowest assessment rankings and scores [he had] personally ever seen." *Id.* at 99. Based on these findings, the SterilTek Report recommended that the Hospital "take corrective action to remedy this situation as soon as possible" (*id.* at 71), which is exactly what it did when it asked Avant to resign just weeks after the report was issued.

Importantly, Avant does not dispute the accuracy of the SterilTek Report, nor does she dispute the conclusions reached therein; rather, she contends that it was unfair for Bode to hold her accountable for the performance of the Operating Room Instrument Technicians because, prior to Bode being hired as her supervisor, "[i]t ha[d] always been a matter of practice for the [Operating Room] staff . . . to supervise and train the [Operating Room] Instrument technicians on a regular basis" and that *"*[i]t was not [Avant's] responsibility to hold the [Operating Room] Instrument Technicians accountable for their actions." ECF No. 57 at 38. The fact that Avant's

previous supervisors may not have held her accountable for the performance of the Operating Room Instrument Technicians does not mean, of course, that Bode, Avant's new supervisor, could not set her own performance expectations and hold Avant to those new standards. Indeed, courts have long-recognized that "'[d]ifferent supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important.'" *Sullivan v. Cato Corp.*, 04-651, 2006 WL 644469, at *11 (D.S.C. Mar. 9, 2006) (quoting *Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002)); *see also Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 474 (6th Cir. 2002) ("It is simply stating the obvious to observe that what may have satisfied one management regime does not necessarily satisfy its successor."). Thus, whether Bode's predecessors held Avant accountable for the performance of the Operating Room Instrument Technicians is irrelevant; what matters is that it is undisputed that Bode *did.*

Although Avant may have disagreed with these new expectations, they were clearly communicated to her and she was aware of them. Indeed, Avant testified at her deposition that, shortly after Bode was hired, Bode informed Avant that she was responsible for the performance of the Instrument Technicians in the Operating Room. *See id.* at 46-47 at 104:12-105:12. Additionally, not long after Avant's resignation, she acknowledged in an e-mail to Paul Zeller, Vice-President of Human Resources at the Hospital, that "[r]ecently[,] what was required of [her] as director of Central changed and [that she] found it hard to understand and comply." ECF No. 42-5 at 133. There can therefore be no serious question that, although Avant may have disagreed with what was being asked of her as the Director of the Central Supply Department, Bode, her supervisor, expected her to maintain a supervisory role over the performance of the

Instrument Technicians in the Operating Room. *See* ECF No. 44 at 4-5 at ¶¶ 11-12; *see also id.* at 17. [2]

Finally, the Court must emphasize that even if Avant was not responsible for supervising the Instrument Technicians in the Operating Room, it would not change the Court's conclusion. To be certain, the findings in the SterilTek Report are not limited to Avant's failures as a supervisor of the Operating Room Instrument Technicians; rather, the report's conclusions expanded far beyond the walls of the Operating Room and revealed a deep and systemic failure of leadership by Avant. *See* ECF No. 45 at 9-97.

Accordingly, Avant has failed to carry her burden of establishing that she was meeting the Hospital's legitimate expectations at the time of her forced resignation in May 2012. Avant has therefore failed to meet her prima facie case of discrimination.[3]

## 2. Legitimate, Non–Discriminatory Reason

Even assuming that Avant had established a prima facie case, the Hospital has put forth sufficient evidence of a legitimate, non-discriminatory reason for terminating her employment. *See Monroe–Lord v. Hytche,* 668 F.Supp. 979, 999 (D. Md. 1987), *aff'd*, 854 F.2d

---

[2] It bears noting that the Court is not moved by Avant's position that she was not adequately trained to supervise the Operating Room Instrument Technicians. *See* ECF No. 57 at 26. Whether Avant was properly trained or otherwise equipped to perform these functions adequately, is not for the Court to judge, as it is not the role of the Court to "sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with discrimination . . . ." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298-99 (4th Cir. 1998).

[3] The Court recognizes that it is becoming "a common practice of the Fourth Circuit to assume, without deciding, that the plaintiff has established a prima facie case in cases where the employer has proffered evidence of a legitimate reason for its adverse action in its motion for summary judgment." *Mandengue v. ADT Sec. Sys., Inc.,* No. 09-3103, 2012 WL 892621, at *16 (D. Md. Mar. 14, 2012) (citing *Holland v. Washington Homes, Inc.,* 487 F.3d 208, 218 (4th Cir. 2007); *Hux v. City of Newport News,* 451 F.3d 311, 314 (4th Cir. 2006); *Laber v. Harvey,* 438 F.3d 404, 432 (4th Cir. 2006) (*en banc*)). The distinction between that approach and the approach taken in this case, however, is academic where, as here, the evidence is overwhelming that the plaintiff was terminated for performance related reasons.

1317 (4th Cir. 1988). Specifically, the Hospital has provided the Court with sufficient evidence to establish that, at the time of Avant's termination, she was not meeting the Hospital's legitimate performance expectations (discussed *supra* Section III.A.1). *See e.g.*, *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (affirming district court's finding of defendant-employer's legitimate non-discriminatory reason for terminating plaintiff where plaintiff "was terminated for performance-related reasons"); *Taylor v. Rite Aid Corp.*, 993 F.Supp.2d 551, 568 (D. Md. 2014) ( "defendants have produced evidence of a legitimate, non-discriminatory reason for [plaintiff's] termination – her documented performance problems in the area of associate counseling"); *Glunt v. GES Exposition Servs., Inc.*, 123 F.Supp.2d 847, 868 (D. Md. 2000) ("plaintiff's poor job performance constitutes a legitimate, nondiscriminatory reason for demoting Plaintiff"); *Mabry*, No. 13-02059, 2014 WL 6875791, at *5 (defendant-employer put forth evidence of legitimate reason for termination because "at the time of [plaintiff's] termination, she was not meeting [her employer's] legitimate performance expectations"). Thus, if Avant had established a prima facie case (which she has not), the burden would now shift back to her to show that the reasons proffered by the Hospital were merely a pretext for a discriminatory purpose, and that *but for* her age, she would not have been forced to resign. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 508 (1993); *see also Clay Printing Co.*, 955 F.2d at 940.

### 3. Pretext

To prove pretext, a plaintiff must either show that the employer's explanation is "'unworthy of credence' 'or offer other evidence that is sufficiently probative of intentional discrimination.'" *Moore v. Leavitt*, No. 04-2819, 2007 WL 5123539, at *3 (D. Md. Feb. 9, 2007) (citing *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004)). "The plaintiff always bears the

ultimate burden of proving that the employer intentionally discriminated against her." *Evans*, 80 F.3d at 959. Avant has failed to meet this burden.

Avant relies on two examples that she claims reveal the Hospital's discriminatory animus. First, Avant claims that during the course of her employment, Bode occasionally inquired about her retirement plans. *See* ECF No. 57 at 46-49. According to Avant, these remarks "give rise to an inference of age discrimination." ECF No. 57 at 43.  Such is not the case.  Passing references to an employee's retirement plans do not, without more, give rise to an inference of age discrimination. Indeed, "a company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful age discrimination." *Colosi v. Elictri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992); *see also Wallace v. O.C. Tanner Recognition Co.*, 299 F.3d 96, 100 (1st Cir. 2002) ("company officials are permitted to gather information relevant to personnel planning without raising the specter of age discrimination"); *Cox v. Dubuque Bank & Trust Co.,* 163 F.3d 492, 497 (8th Cir. 1998) ("[M]any courts have recognized that an employer may make reasonable inquiries into the retirement plans of its employees."); *Shumpert v. Mancor Carolina, Inc.*, No. 300248022, 2005 WL 3088606, at *4 (D.S.C. Jan. 27, 2005) ("even assuming that [the supervisor] had asked the Plaintiff if or when he was going to retire, these comments standing alone do not show the necessary pretext under the applicable caselaw to survive summary judgment"), *aff'd*, 142 F. App'x 786 (4th Cir. 2005). Indeed, Avant has not produced any evidence to suggest that Bode's occasional inquiries about her future plans were harassing or otherwise impacted her ability to perform her job functions. In fact, it appears as though Avant frequently participated in conversations about her retirement plans with her colleagues. *See* ECF No. 42-5 at 31-32 at 80:21-81:7.

Next, Avant claims that a similarly situated, younger employee was treated more favorably than she was. *See* ECF No. 57 at 49-51. Specifically, Avant contends that Tomeka Ryan ("Ryan"), the Director of the Operating Room, who was also supervised by Bode, was "similarly situated [to Avant] in all relevant aspects of their employment." *Id.* at 49. Assuming, without deciding, that Ryan was similarly situated to Avant, the reasons for the differential treatment between the two is clear: the SterilTek Report specifically and repeatedly identified Avant, not Ryan, for her lack of leadership and failure to implement adequate sterilization procedures. Indeed, nowhere in the SterilTek Report or in Kimsey's follow-up letter to Bode was it suggested that a leadership change was necessary in the Operating Room as opposed to the Central Sterile Supply Department. *See* ECF No. 45 at 91. Accordingly, the Court is not persuaded that the differential treatment between Avant and Ryan is evidence of a pretext, especially in light of the fact that two other significantly younger employees in the Central Sterile Supply Department – Erica Smith, an Instrument Technician, age 39, and Kyesha Ross, a Central Sterile Supply Technician, age 22 – were terminated for poor performance by Bode. *See* ECF No. 42-6 at 68-72 at 153:16-157:8.

Thus, even if Avant had established a prima facie case of age discrimination (and she has not), her ADEA claim would still fail as she has not demonstrated that the legitimate business reason offered by the Hospital for Avant's termination was a pretext for discrimination, and specifically that Avant's age was the *but for* cause of her termination.

### B.    State Law Discrimination

Avant also alleges that the Hospital acted in violation of Maryland's anti-discrimination laws, namely § 20-606 of the Maryland Code. *See* ECF No. 1 ¶¶ 35-40. Section 20-606 of the Maryland Code provides, in relevant part:

(a) An employer may not:

> (1) fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of:
>
> > (i) the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, genetic information, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment.

*See* Md.Code Ann., State Gov't § 20-606(a)(1)(i). Like her ADEA claim, Avant contends that she was discriminated against based on her age. *See* ECF No. 1 ¶¶ 35-40. In the absence of direct evidence of age discrimination, as here, "Maryland Courts have traditionally held that in employment discrimination actions, parties must engage in the four-part burden-shifting paradigm described by the United State Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973)." *Dobkin v. Univ. of Baltimore Sch. of Law*, 210 Md. App. 580, 592 (2013); *see also Dep't of Natural Res. v. Heller*, 391 Md. 148, 171, 892 A.2d 497 (2006); *Maryland Comm'n on Human Relations v. Kaydon Ring & Seal, Inc.*, 149 Md.App. 666, 695-98, 818 A.2d 259 (2003). Avant's state law claim is therefore properly analyzed under the same paradigm as her federal ADEA claim. *See Hartman v. Univ. of Maryland at Baltimore*, No. 14-1229, 2014 WL 6981356 (4th Cir. Dec. 11, 2014). Thus, for the same reasons discussed *supra* Section III.A, Avant's state law age discrimination case fails and the Hospital's motion for summary judgment will be granted as to her § 20-606 claim.[4]

### C.   Family Medical Leave Act

---

[4] The Court's conclusion is buttressed by the fact that Avant has not argued that her state law age discrimination claim should be treated any differently than her federal ADEA claim. In fact, in opposing the Hospital's motion for summary judgment, Avant treats the two claims interchangeably, without distinguishing the two.

Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). It is unlawful for any employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). Additionally, the rights afforded to employees under the FMLA include protection from retaliation for exercising these rights. *See Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294 (4th Cir. 2009). Although the FMLA does not contain an explicit prohibition against retaliation, the FMLA regulations state that the "prohibition against 'interference' prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights," 29 C.F.R. § 825.220(c), and this Circuit has long recognized retaliation as a viable claim. *See Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 550 (4th Cir. 2006). Here, Avant has alleged both interference and retaliation claims. For the reasons discussed below, the Hospital is entitled to summary judgment on both of these claims.

### 1.    Interference

Avant maintains that the Hospital interfered with her ability to exercise her FMLA rights by not restoring her to her pre-FMLA position at the conclusion of her FMLA leave, and by forcing her to perform work-related duties while on leave. *See* ECF No. 2 at ¶¶ 51-62; *see also* ECF No. 57 at 40-41.

To make out a prima facie case of interference under the FMLA, 29 U.S.C. § 2617, an employee must first "prove that she was afflicted with an FMLA-qualifying condition, because otherwise she did not have any right under the Act with which her employer could have

interfered." *Rhoads v. F.D.I.C.*, 257 F.3d 373, 384 (4th Cir. 2001). The employee then must show (1) "that the employer violated § 2615 by interfering with, restraining, or denying his or her exercise of FMLA rights"; and (2) that "the employee has been prejudiced by the violation." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002); *see also Rodriguez v. Smithfield Packing Co.*, 545 F.Supp.2d 508, 516, 523 (D. Md. 2008) (stating that "[t]o establish unlawful interference with an entitlement to FMLA benefits, an employee must prove that: (1) she was an eligible employee; (2) her employer was covered by the statute; (3) she was entitled to leave under the FMLA; (4) she gave her employer adequate notice of her intention to take leave; and (5) the employer denied her FMLA benefits to which she was entitled"; noting that a plaintiff cannot recover if the "violation caused no harm").

First, Avant claims her FLMA rights were interfered with when she was not restored to her position as the Hospital's Director of the Central Supply Department after taking FMLA leave. *See* ECF No. 57 at 40-41. "The Fourth Circuit analyzes claims that an employer failed to restore an employee to his or her pre-FMLA position under the interference theory . . . ." *Santorocco v. Chesapeake Holding Co., LLC*, No. 08-3049, 2010 WL 2464972, at *4 (D. Md. June 10, 2010) (citing *Yashenko*, 446 F.3d at 546 (analyzing plaintiff's claim that defendant's reason for eliminating plaintiff's pre-FMLA position was illegitimate as an interference claim)). An employee's right to restoration of his or her pre-FMLA position is not absolute, however. *See Yashenko*, 446 F.3d at 547. The FMLA "does not require an employee to be restored to his prior job after FMLA leave if he would have been discharged had he not taken leave." *Id.* "Therefore, an employer that does not restore an employee returning from FMLA leave can avoid liability by showing 'that [the] employee would not otherwise have been employed at the time reinstatement

is requested.'" *Jordan v. Radiology Imaging Assocs.*, 577 F.Supp.2d 771, 785 (D. Md. 2008) (citations omitted).

Here, as discussed at length *supra* Section I.A, the Hospital has presented unrefuted evidence that Avant failed to perform her duties satisfactorily before she took her FMLA leave. *See* ECF No. 52 at 44. There is therefore no genuine dispute regarding Avant's entitlement to be reinstated: even had she never taken FMLA leave, she would not have been entitled to keep her job following the issuance of the SterilTek Report. *See Mercer v. Arc of Prince George's Cnty., Inc.*, No. 12-0306, 2013 WL 451814, at *3 (D. Md. Feb. 5, 2013), *aff'd sub nom.*, *Mercer v. Arc of Prince George's Cnty., Inc.*, 532 F. App'x 392 (4th Cir. 2013) (interference claim failed where plaintiff was not performing her job adequately prior to taking FMLA leave and was therefore not entitled to be reinstated to her pre-FMLA position); *see also Daugherty v. Wabash Ctr., Inc.*, 577 F.3d 747, 750 (7th Cir. 2009).

Next, Avant contends that her FMLA rights were interfered with by being forced to come into work while on leave. *See* ECF No. 57 at 40-41. Specifically, Avant maintains (1) that she was "forced to go to the Hospital every two (2) weeks to complete payroll for the Central Supply Department's employees"; (2) that she was "called by Ms. Bode approximately once or twice per week and repeatedly asked what she wanted to do about her job"; (3) that she was forced "to go to the Hospital to speak with Mr. Kimsey" about the SterilTek Report; and (4) that she was forced "to go to work on May 24, 2012 under the pretext that Mr. Kimsey's 'good ideas and suggestions' would be discussed, but instead [was] summarily terminated from employment . . . ." *Id.*

"While the mere fact that an employer communicates with an employee during FMLA leave is not *per se* evidence of interference, *see Dodgens v. Kent Mtf. Co.*, 955 F.Supp. 560, 564

(D.S.C. 1997), 'calling [the employee] can be probative of [interference] when the [employee] is asked to continue working.'" *Chauncey v. Life Cycle Eng'g, Inc.*, No. 12-968, 2013 WL 5468237, at *13 (D.S.C. Sept. 30, 2013) (quoting *Sullivan v. Cato Corp.*, No. 04-651, 2006 WL 644469 (D.S.C. Mar. 9, 2006)). "Generally, requiring an employee to perform work during FMLA leave constitutes interference with that employee's FMLA rights." *Chauncey*, No. 12-968, 2013 WL 5468237, at *13; *see also Arban v. W. Pub. Corp.*, 345 F.3d 390 (6th Cir. 2003) (affirming district court's denial of defendant-employer's motion for judgment as a matter of law where plaintiff-employee "presented evidence that he was asked to continue to perform work-related tasks while ostensibly on [FMLA leave]"); *Sherman v. AI/FOCS, Inc.*, 113 F.Supp.2d 65, 70–71 (D. Mass. 2000) ("By essentially requiring Plaintiff to work while on leave . . . Defendant has 'interfered' with Plaintiff's attempts to take leave . . . ."). Here, it is undisputed that on multiple occasions Avant was summoned to the Hospital to process payroll. *See* ECF No. 60 at 20-21. These requests, which were heeded by Avant, clearly interfered with her ability to freely take her FMLA leave.

Unfortunately for Avant, however, it is not enough that the Hospital simply interfered with her ability to exercise her FMLA rights. To support a viable interference claim, Avant is still required to show that the Hospital's interference with her FMLA rights somehow prejudiced her. *See Ragsdale*, 535 U.S. at 89 (2002). Avant cannot satisfy this showing. At most, Avant contends that by "being forced to go to the Hospital" she had "to find someone else to care for her sick son." ECF No. 57 at 42.  But she does not contend that this interference caused her to incur any additional child care expenses, or otherwise caused her any harm or loss. Thus, without any concomitant loss, economic or otherwise, simply having to find someone else to care for her son does not rise to the level of prejudice that is necessary to support an interference claim. *See*

29 U.S.C. § 2617(a)(1)(A) (i)(II); *see also Wonasue v. Univ. of Maryland Alumni Ass'n*, 984 F. Supp. 2d 480, 498 (D. Md. 2013) (concluding that plaintiff's "interference claim fail[ed] as a matter of law" where "for the short span of time Plaintiff remained employed after her request for leave was denied [and before she resigned], she does not claim that she incurred any losses, monetary or otherwise"); *Jones v. Children's Hosp.*, No. 13-6492, 2014 WL 5824902, at *7 (E.D. La. Nov. 10, 2014) ("Prejudice exists when an employee loses compensation or benefits by reason of the violation, sustains other monetary losses as a direct result of the violation, *such as the cost of providing care . . . .*") (emphasis added).

Accordingly, Avant has failed to demonstrate a genuine issue of material fact as to her interference claim. The Court will therefore grant the Hospital's motion for summary judgment as to Avant's interference claim.

### 2. Retaliation

Next, Avant contends that the Hospital retaliated against her after she took FMLA leave by forcing her to resign and by forcing her to perform work-related duties while on leave. *See* ECF No. 2 at ¶¶ 51-62; *see also* ECF No. 52 at 37-38.

"A retaliation claim under the FMLA differs from an interference claim under the FMLA in that 'the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent.'" *Bosse v. Baltimore Cnty.*, 692 F. Supp. 2d 574, 588 (D. Md. 2010) (quoting *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006)). To establish a prima facie case of retaliation under the FMLA, an employee must prove that "(1) she 'engaged in protected activity;' (2) 'an adverse employment action was taken against her;' and (3) 'there was a causal link between the protected activity and the adverse employment action.'" *Wright v. Southwest*

*Airlines*, 319 Fed. App'x. 232, 233 (4th Cir. 2009) (quoting *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004)). "In the Fourth Circuit, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800-06 (1973), applies to claims of retaliation, because they are treated 'as analogous to those derived under Title VII.'" *Bosse*, 692 F. Supp. 2d at 588 (quoting *IJames v. Autumn Corp.*, 2009 WL 2171252, at *8 (M.D.N.C. 2009)). Therefore, after an employee makes out a prima facie case, the burden shifts to the employer, which then must proffer evidence of a legitimate, non-discriminatory reason for the adverse employment action. *See Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 270-71 (4th Cir. 2001). If the employer does so, the burden shifts back to the employee "to prove by a preponderance of the evidence that the proffered reasons were pretextual." *See Dennis v. Columbia Colleton Med. Ctr.*, 290 F.3d 639, 646 (4th Cir. 2002).

Like her interference claim, Avant relies on two sets of allegedly retaliatory conduct that she contends support her retaliation claim. First, Avant argues that she was retaliated against when she was forced to resign while on FMLA leave. *See* ECF No. 57 at 34-35. Although Avant can satisfy her prima facie case of retaliation with respect to her forced resignation, she cannot meet the final step of the *McDonnell Douglas* framework – that is, she cannot prove by a preponderance of the evidence that the reason proffered by the Hospital for Avant's termination (*i.e.* her performance) was a pretext retaliation.

First, as it relates to her prima facie case, Avant engaged in protected activity by requesting FMLA leave. *See Greene v. YRC, Inc.*, 987 F. Supp. 2d 644, 655 (D. Md. 2013). Next, her forced resignation was unquestionably an adverse employment action. *See Yashenko*, 446 F.3d at 551. Finally, "the closeness in time between the [protected activity and the adverse employment action] demonstrates the requisite causal connection between the two events" to

satisfy the third, and final, element of the prima facie case of retaliation. *Mercer*, 532 F. App'x at 398; *see also Yashenko,* 446 F.3d at 551 ("While evidence as to closeness in time far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality."). Avant has therefore satisfied her prima facie case of retaliation with respect to her forced resignation. But that is not enough to defeat the Hospital's motion for summary judgment.

The Hospital presented evidence that Avant was asked to retire due to her unsatisfactory work performance and, as discussed *supra* Section III.A., Avant has not satisfied her burden to establish that the Hospital's proffered explanation is pretext for an unlawful purpose. Given the evidence presented, there is no genuine dispute that Avant's inadequate performance was the reason for which she was terminated. *See Mercer*, No. 12-0306, 2013 WL 451814, at *3.

Next, Avant attempts to support her retaliation claim by contending that she was retaliated against by being "forced to go to work" while on FMLA leave. *See* ECF No. 57 at 36. Specifically, Avant maintains (1) that she was "forced to go to the Hospital every two (2) weeks to complete payroll for the Central Supply Department's employees"; (2) that she was "called by Ms. Bode approximately once or twice per week and repeatedly asked what she wanted to do about her job"; (3) that she was forced "to go to the Hospital to speak with Mr. Kimsey" about the SterilTek Report; and (4) that she was forced "to go to work on May 24, 2012 under the pretext that Mr. Kimsey's 'good ideas and suggestions' would be discussed, but instead [was] summarily terminated from employment . . . ." *Id.* This conduct, however, is insufficient to satisfy her prima facie case because it does not amount to an adverse employment action for purposes of a retaliation claim.

The standard for establishing an adverse employment action in a retaliation claim requires an employee to "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from" exercising her legal rights. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68, 70 (2006). "Materiality is an objective determination, meaning that '[a]cts that carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects may be considered adverse actions, although a mere inconvenience or an alteration of job responsibilities [ ] will not suffice." *Fordyce v. Prince George's Cnty. Maryland*, No. 13-0741, 2014 WL 4244331, at *11 (D. Md. Aug. 25, 2014) (quoting *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1133 (10th Cir. 2010)).

Here, the actions that Avant complains of – namely, being asked to take occasional work-related phone calls while on FMLA leave and occasionally being asked to come into to work while on FMLA leave – are not sufficiently adverse to support her retaliation claim. While the Hospital's requests interfered with Avant's ability to freely exercise her FMLA rights (*see supra* Section III.C.1), these requests, in the retaliation context, amount to little more than mere inconveniences. To be sure, the Hospital's requests did not cause any humiliation to Avant. Nor did the requests damage her reputation, or otherwise harm her future employment prospects. *See Fordyce v*, No. 13-0741, 2014 WL 4244331, at *11. Accordingly, the actions that Avant complains of would not have dissuaded a reasonable worker from exercising her FMLA rights. The Court will therefore grant the Hospital's motion for summary judgment as to Avant's retaliation claim.

## IV. CONCLUSION

For the reasons discussed, Defendant Southern Maryland Hospital, Inc.'s motion for summary judgment, ECF No. 42, is GRANTED. A separate Order follows.


Dated: <u>February 2, 2015</u>                                   <u>            /S/            </u>

                                                                                      George Jarrod Hazel
                                                                                      United States District Judge